IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


DARWIN EVANS,
      Petitioner,

vs.                                 Case No.:  4:15cv266/RH/EMT

JULIE JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 8).  Respondent filed an answer and relevant portions of the state court record (ECF Nos. 25, 27).  The court provided Petitioner an opportunity to file a reply (*see* ECF No. 26), but he has not filed one.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show

that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 27).[1]  Petitioner was charged in the Circuit

Court in and for Leon County, Florida, Case No. 2006-CF-4376, with one count of

armed robbery with a firearm (Ex. A at 4).  Three jury selection proceedings and two

jury trials were conducted.  The first jury selection was conducted on May 25, 2007,

and a jury was impaneled (Ex. B).  Before trial commenced on June 7, 2007, defense

counsel filed a motion in limine to preclude the State from eliciting any in-court

identification from any witnesses (Ex. A at 32–34).  The trial court conducted a

hearing on the motion on June 7, 2007, and denied it (Ex. C).  The trial did not go

forward.

A second jury selection occurred on December 3, 2007, and a jury was

impaneled (Ex. D).  A jury trial was conducted on December 6, 2007 (Ex. E).  After

closing arguments, the clerk of court advised the trial judge that she believed the jury

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 27).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

engaged in inappropriate behavior.  After questioning the jurors, the court declared

a mistrial and discharged the jury (*id.*).

A third jury was impaneled on July 7, 2008 (Ex. F).  Following a trial on July

8, 2008, the jury found Petitioner guilty of armed robbery as charged (Ex. A at

111–12, Ex. G).  The jury additionally found that during the commission of the

robbery, Petitioner actually possessed a firearm, and that he carried, displayed, used,

threatened to use, or attempted to use the firearm (Ex. A at 111).  On July 29, 2008,

Petitioner was sentenced to a mandatory term of ten (10) years in prison, with pre-

sentence jail credit of 30 days (Ex. A at 115–22).

Petitioner, through counsel, appealed the judgment to the Florida First District

Court of Appeal ("First DCA"), Case No. 1D08-3779 (Ex. H).  The First DCA

affirmed the judgment per curiam without written opinion on April 9, 2010, with the

mandate issuing April 27, 2010 (Exs. J, K).  Evans v. State, 31 So. 3d 784 (Fla. 1st

DCA 2010) (Table).

On April 26, 2011, Petitioner, through counsel, filed a motion for post-

conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure

(Ex. L at 1–25).  The state circuit court held an evidentiary hearing on April 30, 2013

(*id.* at 51–108).  The court denied the Rule 3.850 motion on December 20, 2013 (*id.*

at 46–48).  Petitioner appealed the decision to the First DCA, Case No. 1D14-201 (Ex.

M).  The First DCA affirmed the decision per curiam without written opinion on April

23, 2015, with the mandate issuing May 19, 2015.  Evans v. State, 162 So. 3d 988

(Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on May 18, 2015 (ECF No. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an

application for a writ of habeas corpus in behalf of a person in custody pursuant to the

judgment of a State court" upon a showing that his custody is in violation of the

Constitution or laws of the United States.  As the instant petition was filed after April

24, 1996, it is subject to the more deferential standard for habeas review of state court

decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In

relevant part, section 2254(d) now provides:

>    (d)  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
>        (1)  resulted in a decision that was contrary to, or involved
>    an unreasonable application of, clearly established Federal law, as
>    determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that

"[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

    If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is

"whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  See Gill, supra at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask

whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Richter</u>, 562 U.S. at 102; *see also* <u>Gill</u>, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").   The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti v. Quarterman</u>, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

> A.    <u>Ground One, sub-claim A:  "Deprivation of Defendant's due process rights of the Fifth, Sixth, and Fourteenth Amendment [sic] of the Unuited [sic] States Constitution, where counsel was unconstitutionally ineffective in failing to present through cross examination, direct evidence or argument, Evan's [sic] strongest defense theory.  The state courts decision [sic] is clearly contrary to established federal law, where the evidence in support of the denial of Petitioner's post conviction relief motion was not competent or sunstantial [sic]."</u>

Petitioner alleges that during his first trial in December of 2007, Latasha Stallworth, an employee of the Pizza Hut that was robbed, testified that she believed that the robber "knew what to come in for and where," and that he "knew what to do" (ECF No. 8 at 7–12).[3]  Petitioner alleges defense counsel failed to elicit this testimony

---

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

from Ms. Stallworth during the second trial, which resulted in Petitioner's conviction. Petitioner alleges Ms. Stallworth testified at the second trial that she counted money at the cash register, placed it in an unsecured safe, and then walked to another part of the restaurant to print reports, even though this was against Pizza Hut protocol. Petitioner alleges another Pizza Hut employee, Ashley Duke, testified that the restaurant doors were usually locked at any time the employees were counting money, and they should have been locked at the time of the robbery.

Petitioner contends the "strongest aspect" of his defense theory was that the robbery was perpetrated by someone with "inside knowledge" of the restaurant's procedures.  He argues defense counsel was ineffective for failing to argue to the jury that Petitioner, who was unknown to Ms. Stallworth and Ms. Duke, was less likely to enter the restaurant and rob it at precisely the most opportune time, i.e., when the restaurant doors were unlocked, the safe was unsecured, and the amount of available cash was unusually high.  Petitioner contends there is a reasonable probability he would have been acquitted if defense counsel had argued this theory to the jury.[4]

---

[4] Petitioner also contends that his post-conviction counsel violated his due process rights by failing to allow him the opportunity to testify at the post-conviction evidentiary hearing, and the post-conviction court violated his due process rights by failing to inquire of Petitioner whether he waived his right to testify.  The court will address these arguments *infra* as Ground Two.

Respondent concedes that Petitioner exhausted this ineffective assistance of trial counsel ("IATC") claim (ECF No. 25 at 49).  Respondent contends the state court's adjudication of the claim was neither contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts in light of the evidence adduced in state court (*id.* at 50–60).

      1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of <u>Strickland</u> is whether counsel's assistance was "reasonable considering all the circumstances." <u>Strickland</u>, 466 U.S. at 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the

performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed,

"'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.  As the Richter Court explained:

The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

### 2.     Federal Review of State Court Decision

Petitioner presented this IATC claim as Ground I of his Rule 3.850 motion (Ex. L at 12–13).    At the evidentiary hearing, Petitioner's counsel introduced several documents into evidence, including the amended information, the jury instructions, Latasha Stallworth's testimony at Petitioner's first trial (which ended in a mistrial), the deposition of Officer David Stith, and the transcript of Petitioner's second trial (*see* Ex. L at 52–53, Ex. N).

Petitioner's trial counsel, Barbara Hobbs, testified that she was currently a circuit judge in the Second Judicial Circuit of Florida, and prior to that she practiced law for 31 years, with the last 20 years focused in the area of criminal defense (Ex. L at 55–56).  Ms. Hobbs testified that she handled approximately 200 state and federal trials (*id.* at 56).  Ms. Hobbs testified she was retained to represent Petitioner

approximately six months after his arrest for the Pizza Hut robbery (*id.* at 57).  When asked whether she raised the defense that the robber appeared to have been familiar with Pizza Hut procedures, Ms. Hobbs responded:

> A.  I mean, you know, I have always thought Mr. Evans didn't do this crime, so I thought I raised every issue that I knew to raise.  We raised an issue of misidentification.  I tried at one of the trials to impute that there was a man out there that looked just like Mr. Evans who could have committed this crime.  Judge Dempsey would not allow me to get into that.  I tried to raise everything I knew to raise in this case.

> The only thing—all that I can tell you about the internal workings of the business and somebody being familiar with that.  I know that while Mr. Evans was out on appeal bond he and his family talked about somebody.  Latisha [sic] Stallworth had made mention that—or somebody made mention that one of her boyfriends or somebody that was related to one of the people inside of the Pizza Hut was the perpetrator of this crime.  But, that came about after the trial.  I mean, I didn't know of anybody else, other than the person that I tried to contact through Detective Kline, as being the person who could have committed this offense other than Mr. Evans.

> Q [by counsel for the State].  Okay. And we'll get to that in a minute.  But with regards to this person, this individual having internal workings, that information was not brought to your attention or you didn't even hear about that until after the fact?

> A.  That issue—yeah, because Mr. Evans didn't know anything. He was totally foreign to this Pizza Hut, so nobody knew anything to bring me about this case. He had not been there; he had not had any relationship with any of the people in that restaurant, so there was no way that he would have been able to give me some information about somebody on the inside having committed the crime.  That started

coming out when doing some investigation we find that somebody who was dating somebody may have committed the robbery.

Q. Okay. Was that ever addressed in any kind of a new motion for a new trial—

A. No.

Q. —or motion for new evidence?

A. I didn't do any of that, no.

Q. Do you know whether or not he hired anybody to do that?

A. I don't think so, I mean he was—

Q. Were you asked to do that?

A. I wasn't asked to do it. I was in the middle of doing the appeal and he was out on appeal bond, but I know he and his family were aggressively going after that issue.

Q. But you weren't asked to do anything with that?

A. No.

(Ex. L at 63–65).

Counsel for the State asked Ms. Hobbs to discuss her defense theory that another individual, who looked like Petitioner, may have committed the crime (Ex. L at 65–66). Ms. Hobbs testified that she became aware of another man who had a very similar "MO" to the robber of the Pizza Hut (*id.* at 66). Ms. Hobbs testified that

during the first trial, in December of 2007, Detective Kline brought her investigative

file, and the file identified this other person as someone whom Detective Kline was

investigating (*id.*).  Ms. Hobbs testified that she saw a photograph of this other person,

and he looked similar to Petitioner, except a little heavier (*id.*). Ms. Hobbs testified

that she argued to the trial judge that she should be permitted to introduce evidence

regarding this other person, but the judge refused to allow it (*id.*).  After reviewing her

questioning of Detective Kline in the December 2007 trial, Ms. Hobbs explained that

she had questioned Detective Kline outside the presence of the jury about a person

whom Kline was investigating, and looked like Petitioner (*id.* at 67–68).  Ms. Hobbs

questioned Detective Kline as to whether she included that person in the photographic

line-up with Petitioner, when Kline showed the line-up to the Pizza Hut employees,

including Latasha Stallworth and Ashley Duke (*id.* at 68).  Detective Kline responded

no (*id.*).  Ms. Hobbs continued:

> And what I was trying to accomplish is I was trying to get Judge
> Dempsey to allow that person's picture who Ms.—Detective Kline knew
> was out committing robberies and in fact had a record on him, to include
> that person's picture and let the jury see it so that they can compare the
> facial features and everything about that person which was identical to
> Mr. Evans, or very close.  And that's what that was, back and forth,
> because I believed that that person that she had in that robbery was the
> one that was committing these robberies and in fact committed this one.
> . . . .

But I tried very hard to get Judge Dempsey to allow the jury to see that picture because he was—in my opinion, he was a known robber.  He had been charged with robbery; he looked just like Mr. Evans or very similar.  And I thought it was something that was prohibitive [sic] for the jury to see in assessing whether or not there was misidentification in this case.

Q.  And it's your recollection that the Judge did not allow at least the picture in—because I believe the testimony was in front of the jury but at least the picture, the actual picture—

A.  Right.  She wouldn't let the picture in, but Detective Kline was very slippery and wouldn't admit to anything, so it didn't do me any good anyway without the picture.

So, I mean to answer your—I tried.  I mean, I tried to put as many people in front of the jury as possible because this was just—

Q.   And the trial transcripts themselves, would be the best evidence to show your—

A.  Right.

Q.  —the cross examination that you did on all of the different witnesses, with respect to their ID.  Is that correct?

A.  Right.

Q.  And again, with respect to Ground 1 of the defendant's motion that somebody inside the robbery occurred [sic], that information wasn't available and you didn't know anything about that and that that could have occurred [sic] until after—

A.  Until after the trial.

(Ex. L at 68–70).

On cross-examination by Petitioner's post-conviction counsel, Ms. Hobbs was

asked:

> Q.  Now the State asked you on your direct testimony about how
> the fact that this was possibly an inside job was not brought to your
> attention prior to the trial, correct?  You remember talking to the State
> about that just now?
>
> A.  Yeah.
>
> Q.  But you were the defendant's lawyer at the initial trial, correct?
> The trial that resulted in a mistrial?
>
> A.  Right.
>
> Q.   And in that trial you called Latisha [sic] Stallworth as a
> witness, right?
>
> A.  Right—no, I didn't call her.
>
> Q.  Or you cross examined her.  I'm sorry, I misspoke.  You cross
> examined her; she was called as a state witness, correct?
>
> A.  Correct.
>
> Q.  Right?  And at that trial she testified specifically that she felt
> the defendant, or whoever robbed the Pizza Hut, knew what he was
> doing, knew what the employees at the Pizza Hut were doing?  Right?
> Do you not recall?
>
> A.  (Inaudible)
>
> Q.  Ma'am?
>
> A.  Recall her saying that?

Q.  Right, right.  I'm just asking if you recall her saying that.

A.  I don't recall.

(Ex. L at 93–94).

On re-direct examination by the prosecutor, Ms. Hobbs testified:

Q.  As a defense attorney having done 200 plus jury trials, in Mr. Evans' case what did you think his best defense was?

A.  That his girl—not girlfriend, whatever that girl was to him, was there.  She dropped, if that guy—was dropped when she was there getting pizza which she testified that she was there and that Mr. Evans had absolutely nothing to do with this case and it was one of misidentification.  I mean, point [sic] and simple and I believe that today.

(Ex. L at 98).

To summarize, Ms. Hobbs testified that her defense theory was misidentification, and her strategy for obtaining an acquittal based upon that theory was to preclude any in-court identifications by the witnesses, and to elicit testimony from those witnesses which undermined the accuracy and reliability of their identifications of Petitioner as the robber.

In the state circuit court's written decision denying the claim, the court correctly identified Strickland as the applicable legal standard (Ex. L at 47).  The court adjudicated the claim as follows:

The Defendant argues that trial counsel was ineffective in failing to present evidence through cross or direct examination and final argument the defense's strongest theory, misidentification. The thrust of the Defendant's misidentification theory rests on the notion that the robber knew Pizza Hut's closing procedures and protocol. In other words, the robber had some sort of inside knowledge.

Mrs. Stallworth testified that she was shift manager on the night of October 20, 2006. R at page 20. The store hours that day were 8:00 a.m. to 12:00 a.m.. Id. After counting the money, she went to the back to print reports. R. at 21. The safe was located to the right of the front register on the floor and was unsecured. Id. The robbery occurred between the time of 11:15 p.m. to 11:30 p.m. Id. Ms. Stallworth testified that she got a good look at the Defendant as there was nothing blocking her line of sight. R. at p. 36. Ms. Stallworth later identified the defendant in a photo line-up. R. at p. 40–42. It took her "no more than a minute" to identify photo number 2, the Defendant, Darwin Evans. R. at p. 42. Ms. Stallworth also identified the Defendant in court. R. at p. 42–44. Defense Counsel attempted to impeach Ms. Stallworth's identification. R. at p. 45–53.

Ms. Dukes [sic] testified that the Defendant came behind the counter to the area where the register and safe were located and asked her while looking at the safe, "Is this where the money is?" R. at p. 72. Ms. Dukes [sic] could not make any identification. However, Maurice Bounds identified the Defendant (no. 2) and another individual (no. 5) as the possible robber when presented with a photo line-up. R. at p. 102–103. Defense Counsel argued that any in court identification of the Defendant was inadmissible. R. at p. 105–120; 123–125. The Court overruled Counsel's objection. R. at p. 120. Mr. Bounds then identified the Defendant in court.

The only testimony that the robbery was committed by someone who had inside knowledge of the operations of the Pizza Hut restaurant was pure opinion testimony by Ms. Stallworth and amounts to nothing more than speculation. Defense Counsel testified that she did not know

> about an "inside job" theory until after the Defendant's conviction when
> his family "heard" that Ms. Stallworth's boyfriend was possibly
> involved.  Counsel's representation was not ineffective.  Further, based
> on the totality of the evidence, the Defendant has not shown prejudice.
> *Strickland v. Washington*, 466 U.S. 668 (1984).  Ground I is DENIED.

(Ex. L at 46–47).  Petitioner argued this issue on appeal to the First DCA (Ex. M).

The appellate court affirmed the lower court's decision without written opinion.

As previously discussed, to be found deficient, trial counsel's performance must

be "outside the wide range of professionally competent assistance."  Strickland, 466

U.S. at 690.  Professionally competent assistance includes a duty to conduct a

reasonable investigation.  *Id.* at 690–91.  The Supreme Court has emphasized that

only when counsel's choices are made after a "thorough investigation of law and facts

relevant to plausible options" are those choices "virtually unchallengeable."  *Id.* at

690.  When, however, "strategic choices [are] made after less than complete

investigation [they] are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation."  *Id.* at 690–91.  Thus, at bottom,

"counsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary.  In any ineffectiveness case,

a particular decision not to investigate must be directly assessed for reasonableness

in all the circumstances. . . ."  *Id.* at 691.  This means that when a court assesses an

attorney's decision not to investigate, it "must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." <u>Wiggins v. Smith</u>, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

Here, defense counsel's decision to focus on seeking to exclude in-court identifications of Petitioner, and undermine the accuracy and reliability of the witnesses' identifications of Petitioner in the photographic line-up, was reasonable. At the time of Petitioner's second trial, the only <u>known</u> evidence suggesting the "inside job" theory was Latasha Stallworth's testimony in the December of 2007 trial. Any information obtained by Petitioner's family <u>after</u> the second trial, regarding Ms. Stallworth's boyfriend committing the robbery, is insufficient to establish counsel's ineffectiveness, because it was not known at the time of trial. Thus, this leaves the question of whether defense counsel was deficient for failing to ask Latasha Stallworth whether the robber appeared to be familiar with Pizza Hut's procedures during the second trial.

During the first trial, in December 2007, Ms. Stallworth testified that on the night of the robbery, she began counting the money from the cash register by removing it from the register, which was in the front of the restaurant, and counting it just beside the register (Ex. E at 29, 35). Stallworth testified that the safe was

located below and to the right of the cash register, and that she left the safe open (*id.* at 31, 35).  She testified that the cash registers are in the front area of the kitchen (*id.* at 42). Stallworth testified that after she counted the money, she walked to the office in the back of the kitchen (*id.* at 31).  Stallworth testified that she heard commotion in the front of the store, and when she walked toward the front of the store, two other employees told her to get on the floor (*id.* at 31–32).  Stallworth testified that she saw a man standing with a gun, so she got down on the floor (*id.* at 32).  She testified that she heard the man ask, "Where is the white boy," referring to one of the employees, and she told the robber that he was "back there" (*id.* at 32, 49).  Stallworth testified that she could not hear the robber ask for money, but she saw him walk to the right, which was where the cash register and safe were located (*id.* at 49).  Stallworth testified she then saw the robber leave with the money (*id.* at 50).

The prosecutor asked Ms. Stallworth about the robber's demeanor, and she responded, "He was quiet because I guess—I don't know.  For some odd reason I felt like he knew what to come in for and where." (Ex. E at 51).  Defense counsel objected to the testimony as speculation, and the court sustained the objection (*id.*).  The prosecutor then repeated her question about how the robber acted (*id.* at 51). Stallworth responded, "He was quiet.  I mean, he came in, he knew what to do." (*id.*).

She testified that the robbery lasted 2–4 minutes (*id.* at 57–58).  Stallworth testified

that for the first two minutes, the robber stood there, telling everyone to get down and

asking for the money (*id.*).  She testified that he then looked at Ashley Duke, who was

standing at the cash register (*id.* at 60–61).

At Petitioner's first trial, Ashley Duke testified that she was also working at the

Pizza Hut when it was robbed (Ex. E at 78–80).  She testified that she did not see the

robber enter the restaurant, but she saw him standing behind the counter (*id.* at 80).

When questioned about the robber's demeanor, Ms. Duke responded, "I mean, he just

came in there.  And, I mean, he wanted to get his money and he wanted to get out and

he wanted everybody to obey him" (*id.* at 81).  Ms. Duke testified that the robber

looked at her and asked, "Is this where the money is?  Is this the safe?" (*id.* at 83).

Ms. Duke testified that she nodded her head, and the robber kicked the safe open (she

testified that the safe was already open, but not wide open) and took the money (*id.*).

Ms. Duke testified that the man "just went for the safe and then went out the door"

(*id.*).

Defense counsel's failure to question Latasha Stallworth, in the second trial,

about whether the robber appeared to be familiar with Pizza Hut's procedures was not

deficient.  It did not require "inside knowledge" for a robber to know that shortly

before a restaurant's closing, the employees would be processing the day's cash. Further, a robber's immediately walking to the area of the restaurant where the cash register was located did not suggest "inside knowledge"—it was simply common sense.  The safe was immediately below the cash register, and was open, so the robber's kicking it open and taking its contents was also the product of common sense.  What is more, Ashley Duke's testimony undermines any inference of an "inside job," as she noted that the robber asked her where the money was located.

Additionally, the jury heard testimony from which the jury could have inferred that Petitioner was familiar with financial procedures of restaurants in general. Petitioner's employer, David McCuthen, testified that Petitioner was a delivery man for Southern Wine and Spirits, and as such, he delivered wine and liquor to retail locations, and collected payments from those customers (Ex. G at 191–93).  Mr. McCuthen testified that the amounts of payments collected by Petitioner, in the form of cash, checks, and otherwise, ranged from $100.00–$6,000.00.  McCuthen testified that according to Petitioner's time sheet, he worked from 9:00 a.m. to 7:45 p.m. on the day of the robbery (*id.* at 93–94).  From this testimony, the jury could have reasonably inferred that Petitioner had some familiarity with financial procedures of retail

establishments, including restaurants, despite the fact that Petitioner testified he had never been to that particular Pizza Hut (*see* Ex. G at 219).

The state court reasonably determined that Petitioner failed to demonstrate deficient performance and prejudice with respect to defense counsel's failure to present evidence or argument regarding an "inside job" theory.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One, sub-claim A.

B.   Ground One, sub-claim B:  "Deprivation of Defendant's due process rights of the Fifth, Sixth, and Fourteenth Amendment [sic] of the Unuited [sic] States Constitution, where counsel was unconstitutionally ineffective for failing to object to improper witness questioning and argument by the State. The state courts decision [sic] is clearly contrary to established federal law, where the evidence in support of the denial of Petitioner's post conviction relief motion was not competent or sunstantial [sic].

Petitioner claims that defense counsel was ineffective for failing to object to "victim impact" testimony from Latasha Stallworth and Ashley Duke (ECF No. 8 at 13–17).  Petitioner alleges the prosecutor asked each witness how the robbery affected her.  He alleges Ms. Stallworth testified that she was paranoid and stressed, and the robber was "making my life hard."  Petitioner alleges Ms. Duke testified that she only slept 2 ½ hours on the night of the robbery, and had a very important academic test the next morning, and it was "a bad time."  Petitioner alleges the prosecutor commented during closing argument that the witnesses testified that they were

terrified, scared, and stressed.  Petitioner contends defense counsel should have objected on the ground that "victim impact" testimony is inadmissible outside of capital proceedings.  He contends there is a reasonable probability he would have been acquitted had counsel objected to this testimony and argument.

Respondent concedes that Petitioner exhausted this IATC claim (ECF No. 25 at 62).  Respondent contends the state court's adjudication of the claim was neither contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts in light of the evidence adduced in state court (*id.* at 62–68).

      1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground II of his Rule 3.850 motion (Ex. L at 13–15).

At trial, the prosecutor asked Latasha Stallworth how the robbery affected her. Stallworth responded:

> It was really aggravating at this point in time, because I'm in pharmacy school and it's not easy.  And I can't even walk to the car by myself.  I'm very paranoid.  And it's just stressful.  I shouldn't be stressed.  It's already enough for school, but he's making my life hard.

(Ex. G at 37). The prosecutor then asked Ms. Stallworth how she felt on the night of

the robbery. Stallworth responded, "I was in shock. I wasn't—I couldn't even talk."

(*id.*). Ms. Stallworth also testified that she was afraid (*id.* at 38).

The prosecutor asked Ashley Duke the same question. Ms. Duke responded:

> I got like two and a half hours of sleep that night. I actually remember I had a really important test to take the next morning, that Saturday morning, that affected my major. I got about two and a half hours of sleep on it. And it was just, it was a bad time.

(Ex. G at 82).

During closing arguments, the prosecutor addressed this testimony in the

context of the "putting in fear" element of robbery:

> Part two, that during the taking or in the course of the taking, force, violence, assault, or putting in fear was used. Ladies and gentlemen, absolutely, you heard every single witness up here testify to the fact that they were terrified, that they were scared. Latasha Stallworth told you she was hysterical. She couldn't go out at night anymore by herself. She's got all of this stress. Ashley Duke told you that she was terrified for her life.
>
> But let's talk about some other things. Let's talk about why they were terrified. There was the aggressive tone in the defendant's voice, the ordering people to the floor, the roughness in his voice, the use of profanity, and last but certainly not least the fact that he had a gun in his hand. What else do you use a gun for but to put people in fear of their lives.

(Ex. G, 246–47).

During defense counsel's closing argument, she suggested to the jury that Latasha Stallworth was "totally debilitated the night of the robbery" and could not provide any identifying details of the robber (Ex. G at 254–55).  Counsel pointed out that Ashley Duke, who was physically closer to the robber, could not identify Petitioner as the robber (Ex. G at 254–55, 257).  Counsel argued, "How do these other people—between where they were, the obstructions, the fear, they didn't get a good look." (*id.* at 257–58).

The jury instructions regarding armed robbery included the following:

> To prove the crime of Robbery, the State must prove the following four elements beyond a reasonable doubt:
>
> 1.    Darwin Evans took the money or other property from the person or custody of Pizza Hut or an employee thereof.
>
> 2.    Force, violence, assault, or putting in fear was used in the course of the taking.
>
> 3.    The property taken was of some value.
>
> 4.    The taking was with the intent to permanently or temporarily deprive Pizza Hut or an employee thereof of their right to the property or any benefit from it, or appropriate the property of Pizza Hut or an employee thereof to his own use or to the use of any person not entitled to it.
> . . . .
> The taking must be by the use of force or violence or by assault so as to overcome the resistance of the victim, or by putting the victim in fear so that the victim does not resist.  The law does not require that the

victim of robbery resist to any particular extent or that the victim offer any actual physical resistance if the circumstances are such that the victim is placed in fear of death or great bodily harm if he or she does resist. But unless prevented by fear there must be some resistance to make the taking one done by force or violence.

In order for a taking by force, violence, or putting in fear to be robbery, it is not necessary that the taking be from the person of the victim. It is sufficient if the property taken is under the actual control of the victim so that it cannot be taken without the use of force, violence, or intimidation directed against the victim.

(Ex. A at 102–03).

At the post-conviction evidentiary hearing, Ms. Hobbs was questioned about her trial strategy with regard to the witness' testimony about the psychological effects of the robbery:

[BY MS. HOBBS]. Well, I didn't have any trial strategy in terms of how they were impacted months later. My trial strategy was to show the jury about the immediacy about these people behaved during the robbery, for example, Stallworth was so hysterical she couldn't ID anybody. So I wanted to get in front of the jury how the robbery affected her, that she was totally out of it. Ms. Dukes, similarly, she was so overwhelmed by what was going on in the robbery that she too—and she was standing within two feet of the robber and she couldn't ID him. So what I was trying to do is how they were the night of the robbery, or very shortly thereafter, how their demeanor, behavior and their mindset affected their ability to give an accurate ID of the person who did this. I read what was in the motion, I didn't have a trial strategy in terms of how her pharmacy degree and all these other things were being affected because that wasn't something I was thinking about. I was thinking about she was hysterical and crazy the night of the robbery. And I wanted the jury to hear that. . . . And she [was] discombobulated and then the same thing with Ms.

> Dukes.  She was so crazy that she couldn't even see somebody within
> two feet of her.  And those items I wanted to get in front of the jury
> because I wanted to buckle their ID.

(Ex. L at 70–71).

On cross-examination, Petitioner's post-conviction counsel asked Ms. Hobbs whether she believed that the way a witness is affected in the long-term by a traumatic event is relevant to the facts at issue in a defendant's trial.  Ms. Hobbs responded, "No, not really, except for the immediacy, the immediate right after the incident I think is relevant, because you want to—especially if you got an ID case." (Ex. L at 89–90).  Asked again whether long-term negative impacts a witness suffers after being the victim of a violent crime can be prejudicial to a defendant, Ms. Hobbs responded, "Could be, yeah." (*id.* at 90).

The state circuit court adjudicated the IATC claim as follows:

> The Defendant argues that trial counsel was ineffective for failing
> to object to the victim's impact testimony.  Trial counsel maintained that
> the best defense was misidentification.  She wanted to exploit the
> victim's fear (an element of the crime) to argue their inability to recall
> details of the robber's appearance and their inability to accurately
> identify the perpetrator.  The victim's statements in this regard were not
> made a feature of the trial.  It is common sense that someone robbed at
> gunpoint would be afraid and possibly suffer long term affects from such
> and experience.  The Court finds that trial counsel's failure to object was
> not ineffective.  Even if it was, the Defendant has not shown prejudice.
> Ground II is DENIED.

(Ex. L at 47).  Petitioner appealed this issue to the First DCA (Ex. M).  The appellate court affirmed the lower court's decision without written opinion.

Ms. Stallworth's and Ms. Duke's testimony regarding how they felt on the night of the robbery was relevant to the "putting in fear" element of the offense.  Further, its prejudicial effect did not outweigh its probative value.  Therefore, defense counsel had no meritorious basis to object to the testimony.  Further, defense counsel used this testimony to benefit Petitioner's misidentification defense, by arguing that the emotional state of the witnesses rendered them unable to accurately identify the robber.  Moreover, although Ms. Stallworth additionally testified to the lingering effects of the robbery, the prejudicial effect of this testimony was minimal, and defense counsel's objecting to it would only have drawn more attention to it.

Petitioner failed to show that the state court unreasonably applied <u>Strickland</u> in adjudicating this IATC claim.  Therefore, he is not entitled to federal habeas relief on Ground One, sub-claim B.

C.    <u>Ground One, sub-claim C:  "Deprivation of Defendant's due process rights of the Fifth, Sixth, and Fourteenth Amendment [sic] of the Unuited [sic] States Constitution, where counsel rendered unconstitutionally ineffective assistance when she failed to ensure that the jury was properly instructed.  The state courts decision [sic] is clearly contrary to established federal law, where the evidence in support of the denial of Petitioner's post conviction relief motion was not competent or sunstantial [sic]."</u>

Petitioner alleges he was charged with taking over $300.00 from Ashley Duke, an employee of the Pizza Hut (ECF No. 8 at 19–216).  Petitioner contends defense counsel failed to object to the jury instructions on robbery.  Petitioner alleges the instructions allowed the jury to convict him of taking money from "the person or custody of Pizza Hut or an employee thereof," not specifically Ashley Duke, as was charged in the information.  He alleges the instructions also allowed the jury to convict him of appropriating the property of Pizza Hut or an employee thereof to his own use or the use of any person not entitled to it, even though that theory of robbery was not charged in the information.  Petitioner contends defense counsel should have objected on the ground that instructing the jury on uncharged, alternative theories of the offense was impermissible.  He contends he would have been acquitted if counsel had objected to the jury instructions.

Respondent concedes that Petitioner exhausted this IATC claim (ECF No. 25 at 70).  Respondent contends the state court's adjudication of the claim was neither contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts in light of the evidence adduced in state court (*id.* at 71–77).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground III in his Rule 3.850 motion (Ex. L at 16–17).  The state circuit court adjudicated the claim as follows:

> The Defendant argues that trial counsel was ineffective for failing to object to the jury instruction and ensuring that the instruction was in accordance with the charge.  The Court finds that the jury was properly instructed.  Trial counsel was not ineffective.  Finally, the Defendant has failed to demonstrate prejudice.  Ground III is DENIED.

(Ex. L at 47).  Petitioner argued this issue on appeal to the First DCA (Ex. M).  The appellate court affirmed the lower court's decision without written opinion.

The amended information charged Petitioner as follows:

> COUNT I:  On October 21, 2006, did unlawfully take more than $300.00 of United States currency or other property from the person or custody of Ashley Duke a clerk at the Pizza Hut, with intent to either permanently or temporarily deprive the person or the owner of the money or property, and in the course of the taking used force, violence, assault, or putting in fear, and in the course of committing the robbery carried and actually possessed a firearm, contrary to Sections 775.087 and 812.13(2)(a), Florida Statutes.

(Ex. A at 4).

Florida's robbery statute provides, in relevant part:

> (1) "Robbery" means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the

owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.

(2)(a) If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla Stat. § 812.13(1), (2)(a).

Florida's standard jury instructions on robbery provides:

To prove the crime of Robbery, the State must prove the following four elements beyond a reasonable doubt:

>  1.  (Defendant) took the (money or property described in charge) from the person or custody of (person alleged).
>
>  2.  Force, violence, assault, or putting in fear was used in the course of the taking.
>
>  3.  The property taken was of some value.
>
>  4. The taking was with the intent to permanently or temporarily [deprive (victim) of [his] [her] right to the property or any benefit from it] [appropriate the property of (victim) to [his] [her] own use or to the use of any person not entitled to it].

. . . .

In order for a taking of property to be robbery, it is not necessary that the person robbed be the actual owner of the property.  It is sufficient if the victim has the custody of the property at the time of the offense.

Fla. Standard Jury Instructions in Criminal Cases 15.1, Robbery.

At Petitioner's trial, Ashley Duke testified that she and other employees of Pizza Hut were working on October 21, 2006, when a man entered the restaurant with a gun, demanded that the employees lie on the floor, and took money from the restaurant's safe.  Ms. Duke testified that she was the closest employee to the safe when the robber took money from it.  Latasha Stallworth testified that she was the manager on duty of the Pizza Hut on the night it was robbed.  She testified that she was several feet from the safe when the robber took the money out of the safe at gunpoint.

The jury instructions in Petitioner's case instructed the jury as follows, in relevant part:

> To prove the crime of Robbery, the State must prove the following four elements beyond a reasonable doubt:
>
> 1.  Darwin Evans took the money or other property from the person or custody of Pizza Hut or an employee thereof.
>
> 2. Force, violence, assault, or putting in fear was used in the course of the taking.
>
> 3. The property taken was of some value.
>
> 4. The taking was with the intent to permanently or temporarily deprive Pizza Hut or an employee thereof of their right to the property or any benefit from it, or appropriate the property of Pizza Hut or an employee

> thereof to his own use or to the use of any person not
> entitled to it.
>
> . . . .
>
> In order for a taking of property to be robbery, it is not necessary
> that the person robbed be the actual owner of the property.  It is
> sufficient if the victim has the custody of the property at the time of the
> offense.

(Ex. A at 40–41).

Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of Strickland, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . [the federal habeas court] must defer to the state's construction of its own law."  Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted)[5]; see also Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a

---

[5] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227 F. App'x 806 (11th Cir. 2007).

state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); Herring v. Sec 'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim:  "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . .  It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, as in Alvord, Callahan, and Herring, the state court has already answered the question of whether the jury instructions properly instructed the jury on the offense charged in the information—the jury was properly instructed.  This court must

defer to the state court's determination of state law.  *See* <u>Bradshaw v. Richey</u>, 546

U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); <u>Mullaney v. Wilbur</u>, 421 U.S.

684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *see also* <u>Jones v. Kemp</u>, 794 F.2d

1536, 1540 (11th Cir. 1986) ("State court jury instructions ordinarily comprise issues

of state law . . .").  Indeed, the robbery instructions given in Petitioner's trial mirrored

Florida's standard jury instructions on robbery, including the intent element.  Further,

both the amended information and the jury instruction identified the victim of the

robbery as an agent of Pizza Hut.

The failure by Petitioner's counsel to object to the robbery instructions cannot

be deemed deficient performance, and Petitioner cannot show he was prejudiced by

counsel's failure to object, because an objection had no arguable basis for success.

Therefore, Petitioner is not entitled to relief on Ground One, sub-claim C.

> D.    <u>Ground One, sub-claim D: "Deprivation of Defendants [sic] due process
> rights of the Fifth, Sixth, and Fourteenth Amendment [sic] of the Unuited [sic]
> States Constitution, where counsel rendered unconstitutionally ineffective
> assistance of counsel in failing to call an available, materially exculpatory
> defense winess [sic].  The state courts decision [sic] is clearly contrary to
> established federal law, where the evidence in support of the denial of
> Petitioner's post conviction relief motion was not competent or sunstantial
> [sic]."</u>

Petitioner alleges that Therese Marshall, an employee of Pizza Hut, testified that

she found a GEICO insurance card in the restaurant's parking lot on the morning after

the robbery (ECF No. 8 at 22–29).  The insurance card listed Petitioner as the insured. Petitioner alleges Officer Stith, an officer with Tallahassee Police Department, testified that a K-9 officer arrived at the Pizza Hut after the robbery and attempted to track a suspect.  Petitioner contends defense counsel should have called the K-9 officer as a witness at trial.  He alleges the officer would have testified that he personally observed the condition of the parking lot just minutes after the robbery, and did not observe or recover a GEICO insurance card from the parking lot.  Petitioner contends there is a reasonable probability he would have been acquitted if defense counsel had interviewed the K-9 officer and presented his testimony at trial.

Respondent concedes that Petitioner exhausted this IATC claim (ECF No. 25 at 79).  Respondent contends the state court's adjudication of the claim was neither contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts in light of the evidence adduced in state court (*id.* at 80–87).

   1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

   2. Federal Review of State Court Decision

Petitioner raised this claim as Ground IV in his Rule 3.850 motion (Ex. L at

17–20).  The state circuit court adjudicated the claim as follows:

> In his fourth ground, the Defendant argues that counsel was
> ineffective for failing to call an exculpatory witness, the K-9 officer, who
> responded to the scene to track the suspect.  The Defendant's GEICO
> Insurance card was found the next day near the front door of the Pizza
> Hut.  The Defendant claims had the K-9 officer been called to testify, it
> could have refuted the theory that the insurance card laid there overnight.
> There is no evidence that the card was dropped or lost the next day.  The
> defense admitted that they could not establish who the K-9 officer was
> or that any K-9 officer searched the parking lot.  The defense theory as
> to Ground IV is pure speculation.  Trial counsel was not ineffective.
> Even if she was, the Defendant fails to demonstrate prejudice.  Ground
> IV is DENIED.

(Ex. L at 47).  Petitioner argued this issue on appeal to the First DCA (Ex. M).  The

appellate court affirmed the lower court's decision without written opinion.

At Petitioner's trial, Officer Stith testified that he was the first officer to arrive

at the Pizza Hut after the robbery (Ex. G at 198–99).  He testified that he believed that

a K-9 officer also arrived at the scene and attempted to track the robber, but he

admitted that his written report did not reference a K-9 officer (*id.* at 200).  Officer

Stith testified that he did not search the parking lot, and he was not aware of whether

any other officer searched it (*id.* at 200–01).

"The mere fact that other witnesses might have been available or that other

testimony might have been elicited from those who testified is not a sufficient ground

to prove ineffectiveness of counsel."  Waters v. Thomas, 46 F.3d 1506, 1512, 1514

(11th Cir. 1995).  "Complaints of uncalled witnesses are not favored, because the

presentation of testimonial evidence is a matter of trial strategy and because

allegations of what a witness would have testified are largely speculative."  Buckelew

v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Here, Petitioner did not present any evidence to the state court that a K-9

officer, or any other officer, searched the Pizza Hut parking lot after the robbery.  In

the absence of such evidence, the state court reasonably concluded that Petitioner

failed to demonstrate he was prejudiced by defense counsel's failure to investigate the

alleged K-9 officer, or present his or her testimony at trial.  Therefore, Petitioner is not

entitled to habeas relief on Ground One, sub-claim D.

E.      Ground One, sub-claim E:  "Deprivation of Defendant's due process rights of the Fifth, Sixth, and Fourteenth Amendment [sic] of the Unuited [sic] States Constitution, where counsel rendered unconstitutionally ineffective assistance of counsel when she failed to properly reserch [sic] and argue the impropriety of witness Bounds' in-court identification.  The state courts decision [sic] is clearly contrary to established federal law, where the evidence in support of the denial of Petitioner's post conviction relief motion was not competent or sunstantial [sic]."

Petitioner alleges that during his first trial in December 2007, Mark Owens

testified that he and other State's witnesses, including Maurice Bounds, were shown

a photograph of Petitioner at a meeting at the State Attorney's office prior to trial

(ECF No. 8 at 29–34).  Petitioner alleges that Maurice Bounds testified during the first

and second trials that during the month after the robbery, he viewed a photographic

line-up consisting of six pictures, and picked out two photographs, one of which was

Petitioner's photograph.   Petitioner alleges Mr. Bounds also identified him in court

as the robber.  Petitioner acknowledges that defense counsel objected to Mr. Bounds'

in-court identification on the ground that the State failed to establish that it  was

reliable and based solely upon Bounds' independent recollection of the robber at the

time of the crime.  However, Petitioner contends defense counsel should have argued

that Bounds' identification was made under unduly suggestive circumstances.

Petitioner argues that Ms. Hobbs also represented him on direct appeal, and cited

Edwards v. State, 538 So. 2d 440 (Fla. 1989), in support of the argument that the trial

court erred by allowing Mr. Bounds' in-court identification; however, counsel failed

to cite that case to the trial court.  Petitioner contends if defense counsel had argued

that Bounds' in-court identification was made under unduly suggestive circumstances,

and cited Edwards in support, there is a reasonable probability the trial court would

have precluded the State from eliciting an in-court identification from Mr. Bounds.

     Respondent concedes that Petitioner exhausted this IATC claim (ECF No. 25

at 89–90).  Respondent contends the state court's adjudication of the claim was neither

contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts in light of the evidence adduced in state court (*id.* at 90–99).

> 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground V in his Rule 3.850 motion (Ex. L at 20–22).  Ms. Hobbs testified as follows at the post-conviction evidentiary hearing:

> Q [by counsel for the State].  You indicated before that you had argued a motion in limine and that was denied.  Is that correct?
>
> A.  Uh-huh.
>
> Q.  And you had the opportunity to cross-examine—cross examine Ms. Stallworth and Ms. Duke in both trials.  Is that correct?
>
> A.  Right.
>
> Q.  Did you have any reason to believe that rearguing a motion in limine was going to result in a different outcome?
>
> A.  As to those two ladies?
>
> Q.  Right.
>
> A.  No.

Q.   With respect to Mr. Bounds, what about that do you remember; what about that do you recall?

A.  I really can't remember exactly why you and I got into it about Mr. Bounds because we ended up doing a sidebar motion in limine when you asked some question.  But he too—I was trying to stop from being able to testify at trial definitively that Mr. Evans was the person who did this because he was between—so when you asked the question is there somebody in the room that you could identify I objected and then we had a whole long motion in limine hearing on that issue.  I raised <u>Fitzpatrick</u>, which was based on <u>Edward</u> [sic], the same things that set out in <u>Edward</u> [sic] set out in <u>Fitzpatrick</u>.  And Judge Dempsey denied my motion.  I tell you I did everything I could do to stop that in court identification to the point that I actually had a person sit at that table to look just like Mr. Evans, or very similar to him, to try to throw the witnesses off.

Q.  Okay. I'll come back to that, but with respect to Mr. Bounds specifically, you went through and had a—

A.  Hearing with Judge Dempsey.

Q.  —stopped his testimony and had a full blown hearing in the middle of his testimony?

A.  This is correct.

Q.  And in fact, I believe that the trial transcript will show that there was actually proffered testimony from Mr. Bounds.  Is that correct?

A.  Correct.

Q.  And you argued <u>Fitzpatrick</u>?

A.  I argued <u>Fitzpatrick</u>, which I did in the appeal in this case, which <u>Edward</u> [sic] and <u>Fitzpatrick</u> trapped themselves.  I mean I didn't use—yeah.  I ordered <u>Fitzpatrick</u>.

Q.   And you referenced Edwards I believe, in his motion.   In Ground 5 of his motion, Mr. Evans indicates that the leading case on this issue is Edwards v. State, 538 So. 2d 440, Florida Supreme Court 1989 and that you cited to Edwards in the appellate court, but you failed to forward that argument to the trial court, however; in your reading of Fitzpatrick and of Evans [sic] they set out the same exact law.  Is that correct, is that what—

A.  I made the same argument on appeal that I made at the trial level.

Q.  Fitzpatrick alleges the same factors as it does—as the Court does in Edwards, with regards to in court identification?

A.  And let me just say this.  In Bounds [sic] I was arguing to Judge Dempsey that—I think this is what I was arguing.  I was arguing that all the time passage and all the things that Edwards and Fitzpatrick set out.  They applied to Bounds' testimony; he shouldn't be allowed to testify.

And I guess the distinction that the defense may be making is that I didn't argue that he has been sitting in court looking at Mr. Evans and that would taint his testimony.  I made that argument to Judge Miller early on and didn't get anywhere with that.  And I didn't renew that argument to Judge Dempsey, but I had originally made that argument because you know, he was sitting on the front row and these people were sitting behind him.

So I told Judge Miller it's just not fair that these people are able to come in here and ID him positively when they couldn't do it before because they keep seeing him in court, in pretrial and all these different places and the man was tried three or four times.  Now I submit I didn't make that argument to the judge with Bounds; I made the argument that his testimony was flawed because of time and he didn't have the opportunity to observe Mr. Evans, or whoever did this crime.  I guess

that's the only distinction between what I made before Miller and what
I made before Judge Dempsey.  Do you understand?

Q.  Okay.  With regards to the ruling that Judge Dempsey made
though, after arguing the case law that you had in front of you that day,
what was her ruling?

A.  She denied it, she said no.  And she allowed him to testify and
he did.  She [sic] didn't ID him, he just said that he recognized
somebody in the courtroom.

Q.  And so the testimony was that he recognized somebody, not
necessarily an identification.

A.  Right.  He didn't do an in court ID on him.

Q.  But you still made every attempt that you could think of in
order to keep all of that—keep that out?

A.  Yeah, what he said about the 99 percent thing.

(Ex. L at 81–85).  Ms. Hobbs admitted that she researched the legal issue at home the

night before, and inadvertently left the copy of Fitzpatrick case that she had printed

at home (*id.* at 96).  However, she testified that the trial court permitted her to research

the issue in court, and she performed that research (*id.*).

The state circuit court adjudicated the claim as follows:

As to Ground V, the Defendant argues that trial counsel was
ineffective for failing to bring her research to court and challenge an "in
court" identification of the Defendant by Mr. Bonds [sic]. While trial
counsel did forget her research, the Judge gave her ample opportunity to
retrieve and argue the law, which she did.  R at p. 104–120.  The trial

> court allowed the identification.  Trial counsel was not ineffective.
> Moreover, given the other witness identifications, the Defendant has
> failed to prove the second prong of *Strickland*, prejudice.  Ground V is
> DENIED.

(Ex. L at 47–48).  Petitioner argued this issue on appeal to the First DCA (Ex. M).

The appellate court affirmed the lower court's decision without written opinion.

The state court's findings of fact are supported by the trial transcript.  When the

prosecutor asked Maurice Bounds to identify the robber in the courtroom, defense

counsel objected (Ex. G at 104).  At a side bar conference, defense counsel moved to

limit Mr. Bounds' ability to make an in-court identification on two grounds:  (1) Mr.

Bounds was uncertain of the robber's identity at the time he viewed a photographic

line-up during the month following the robbery; and (2) an in-court identification

would be tainted, because Bounds had viewed Petitioner at the first trial (*id.* at

104–05).  The trial judge asked defense counsel whether she had any legal basis for

her argument, and counsel responded that when she left her house that morning she

inadvertently left her research at home (*id.*).  Defense counsel requested time to

perform research, and the judge permitted her to do so (*id.* at 105).  Counsel

researched the issue, and cited State v. Gomez, 937 So. 2d 828 (Fla. 4th DCA 2006),

and Fitzpatrick v. State, 900 So. 2d 495 (Fla. 2005) in support of her argument (*id.* at

105–07).  Defense counsel argued that the factors weighed against admission of Mr.

Bounds' in-court identification (*id.* at 107–09; 111–12).

The prosecutor proffered Mr. Bounds' testimony (Ex. G at 112–14).  Bounds

admitted that he was "between two people" when he viewed the photographic line-up,

but upon being in Petitioner's presence, he was "95 percent sure" that Petitioner was

the robber (*id.* at 113–14).  On proffered cross-examination, defense counsel asked

Mr. Bounds whether he was present at the State Attorney's Office when other

witnesses were shown pictures of Petitioner, and Bounds responded that he was

present (*id.* at 115–16).  Mr. Bounds described the meeting:

> A.  I saw basically the same lineup that I was, basically that I was shown before, so it sounds like you're talking about an individual picture.  No, I didn't see an individual picture with just your client, the defendant, whatever.  But I saw the same thing that I was shown before, which was the photo lineup with the six, well, with the six, with my—well, with the people that were shown to me.

> Q. Right.  But were you—okay.  You were shown that with all the other witnesses, correct?

> A.  Yes.

> Q.  And Ms. Stallworth was present as well, correct?

> A.  Yes.

> Q.  With her identification and her lineup was there, too, where she had ID'd him, too, correct?

Case 4:15-cv-00266-RH-EMT   Document 28   Filed 11/21/16   Page 54 of 64

A. I know, I know, I know she had her own, so I don't—so I think so. I was looking at mine, honestly.

(Ex. G at 117).

Following Mr. Bounds' proffered testimony, defense counsel argued further against any in-court identification, including an argument that there was an out-of-court tainted identification at the State Attorney's Office (Ex. G 118–20). The trial judge ruled as follows:

> THE COURT: All right. I'm going to find that the in-court identification is admissible. I mean, Mr. Bounds is testifying that he has an independent recollection of what the defendant looked like. He had an opportunity to observe him on the date that this allegedly occurred. He was able to narrow it down to two folks on the photo lineup, which is State's 2B. And he's explained that now that he's had a chance to observe the defendant in court, he's 90 to 95 percent sure that he is, in fact, sure that it is Mr. Evans that he saw in the Pizza Hut that evening. And I don't think there's been any evidence of any taint, out-of-court taint, so I'm going to find that the in-court ID is admissible.

(Ex. G at 120). Mr. Bounds testified that he recognized Petitioner as the robber of the Pizza Hut (*id.* at 121). Defense counsel cross-examined Bounds about his pre-trial meeting at the State Attorney's Office with other witnesses present (*id.* at 127–28). Bounds testified that he and the other Pizza Hut employees were "given their lineups" and copies of the written statements they had provided to police (*id.* at 128). Mr.

Bounds also admitted that he had previous opportunities to observe Petitioner in other hearings (*id.*).

Prior to Mr. Bounds' testimony, Latasha Stallworth identified Petitioner in court as the robber (Ex. G at 42–43).

Petitioner contends defense counsel should have argued that Mr. Bounds' identification was made under unduly suggestive circumstances, and cited Edwards v. State, 538 So. 2d 440 (Fla. 1989). However, in Fitzpatrick, a case which defense counsel argued, the court quoted from Edwards in stating the factors which must be considered by the trial court in gauging the reliability of an in-court identification:

This Court in *Edwards* explained:

> In gauging the reliability of an in-court identification, the trial judge must consider the following factors: the prior opportunity the witness had to observe the alleged criminal act; the existence of any discrepancy between any pretrial lineup description and the defendant's actual description; any identification prior to the lineup of another person; any identification by picture of the defendant prior to the lineup; failure to identify the defendant on a prior occasion; any time lapse between the alleged act and the lineup identification; and any other factors raised by the totality of the circumstances that bear upon the likelihood that the witness' in-court identification is not tainted by the illegal lineup.

> *Id.* at 443.  It is the State's burden to demonstrate by clear and
> convincing evidence that the courtroom identification had an
> independent source . . . .

Fitzpatrick, 900 So. 2d at 519 (quoting Edwards, 538 So. 2d at 443).  Ms. Hobbs

included Edwards in her appellate challenge to the trial court's admitting the in-court

identifications of both Mr. Bounds and Ms. Stallworth (Ex. H), but the First DCA

rejected counsel's arguments (Ex. J).

The state court reasonably concluded that defense counsel was not ineffective

with respect to her objection to an in-court identification by Mr. Bounds.  Therefore,

Petitioner is not entitled to habeas relief on Ground One, sub-claim E.

> F.    Ground One, sub-claim F:  "Deprivation of Defendants [sic] due
> process rights of the Fifth, Sixth, and Fourteenth Amendment [sic] of the
> United States Constitution, where the cumulative effect of multiple
> errors deprived Evans of a fair trial.  The state courts decision [sic] is
> clearly contrary to established federal law, where the evidence in support
> of the denial of Petitioner's post conviction relief motion was not
> competent or sunstantial [sic]."

Petitioner contends that the cumulative effect of the individual errors of defense

counsel, identified *supra*, deprived him of a fair trial (ECF No. 8 at 34–37).

Respondent contends Petitioner failed to exhaust this claim in the state courts;

therefore, it is procedurally barred from federal review (ECF No. 25 at 101–03).

Respondent argues that although Petitioner presented a "cumulative effect" claim as

Ground VI of his Rule 3.850 motion, he failed to present it on direct appeal, which he was required to do under Florida procedural rules if he wished to obtain review by the First DCA (*id.*).  Respondent additionally contends that even if Petitioner exhausted his claim, he is not entitled to relief, because the Supreme Court has not recognized the cumulative error doctrine in the context of IATC claims (*id.* at 103–07).

Petitioner raised this "cumulative effect" claim as Ground VI of his Rule 3.850 motion (Ex. L at 22–23).  The state circuit court adjudicated the claim as follows:

> In Ground VI, the Defendant argues that trial counsel's cumulative errors resulted in such prejudice as to require a new trial. Trial counsel's strategy was misidentification.   Trial counsel argued to keep the identification out.  She even had another attorney dress up like the Defendant to prove her point of misidentification.  Her representation was not ineffective.  The defendant failed to demonstrate how these errors if indeed ineffective would have resulted in a different outcome. Ground VI is DENIED.

(Ex. L at 48).  Petitioner appealed the decision to the First DCA; however, in his initial brief,  he did not include any "cumulative effect" argument (*see* Ex. M).

Under Florida law, an appellant who fails to fully brief a claim on appeal from an order denying post-conviction relief after an evidentiary hearing is procedurally barred from obtaining appellate review of that claim.  *See* Sweet v. State, 810 So. 2d 854, 870 (Fla. 2002); Duest v. Dugger, 555 So. 2d 849, 851 (Fla 1990) (holding that issues raised on appeal from order denying post-conviction relief were procedurally

barred where petitioner received an evidentiary hearing on his Rule 3.850 motion and failed to fully brief and argue the points on appeal); *see also* <u>Atwater v. Crosby</u>, 451 F. 3d 799, 810 (11th Cir. 2006) (holding that petitioner, who had received an evidentiary hearing on his Rule 3.850 motion, procedurally defaulted his right-to-testify claim when he failed to argue it in his initial brief on appeal from the denial order; raising it in his reply brief was not proper exhaustion).

Because Petitioner failed to fairly present his "cumulative effect" claim to the post-conviction appellate court, he failed to satisfy the exhaustion requirement. *See* <u>Duncan v. Henry</u>, 513 U.S. 364, 365–66, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995). Therefore, he is not entitled to a merits review of this claim.

Notwithstanding Petitioner's failure to exhaust his claim, the claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary,[6] the Eleventh Circuit has never expressly

---

[6] *See* <u>United States v. Baker</u>, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate

recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254.   *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S.

---

reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (internal quotations and citations omitted);  United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir.1995) and citing United States v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996)).

637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[7]

In any event, cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as

---

[7] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas. The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas. *See* Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. *See* Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue. *See* Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland. *See* Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

it is; we decline to adopt a rule that would have the effect of soliciting more and has

nothing else to recommend it.  Twenty times zero equals zero."); *see also* United

States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Mancuso v. Olivarez, 292 F.3d 939,

957 (9th Cir. 2002) (where there is no single constitutional error, nothing can

accumulate to the level of a constitutional violation); United States v. Hardy, 224 F.3d

752, 757 (8th Cir. 2000); Angelone, *supra*; Moore v. Reynolds, 153 F.3d 1086, 1113

(10th Cir. 1998); United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A]

cumulative-error analysis should evaluate only the effect of matters determined to be

error, not the cumulative effect of non-errors."); United States v. Conteh, 234 F.

App'x. 374, 2007 WL 1229043 (6th Cir. 2007).  Thus, Petitioner must show error

with respect to at least two of his individual claims.

As previously discussed, Petitioner has not shown error of a constitutional

dimension with respect to any of the alleged errors of trial counsel.  Therefore, he is

not entitled to federal habeas relief on this "cumulative error" claim.

> G.    Ground Two: "Deprivation of Defendants [sic] due process rights
> of the Fifth, Sixth, and Fourteenth Amendment [sic] of the United States
> Constitution, Defendant [sic] due process rights were violated when post
> conviction counsel did not allow Defendant an opportunity to testify at
> the hearing in order to establish 'prejudice.'  The state courts decision
> [sic] is clearly contrary to established federal law, where the evidence in
> support of denial of Petitioner's post conviction relief motion was not
> competent or sunstantial [sic]."

In each of Petitioner's grounds for relief set forth *supra*, as well as in Petitioner's supporting memorandum, Petitioner argues that his post-conviction counsel violated his due process rights by failing to allow him to testify at the post-conviction evidentiary hearing (ECF No. 8 at 12–13, 17–18, 21–22, 28–29, 33–34, 36–37; ECF No. 8-1, Memorandum of Law in Support of Habeas Corpus).  Petitioner contends the post-conviction court also denied his due process by failing to ask Petitioner whether he wished to waive his right to testify at the evidentiary hearing (*id.*).

The federal habeas statute expressly precludes Petitioner's constitutional claim based upon his collateral counsel's failure to allow him to testify at the post-conviction evidentiary hearing.  *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").  Additionally, a defendant does not have a constitutional right to testify in person at post-conviction proceedings.  *See* Oken v. Warden, MSP, 233 F.3d 86, 93 (1st Cir. 2000).  Therefore, Petitioner is not entitled to federal habeas relief on this claim.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the amended petition for writ of habeas corpus (ECF No. 8) be

**DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 21ˢᵗ day of November 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**